Board of Trust Company Incorporation
No. 7067

## THE VALLEY BANK

v.

## STATE OF NEW HAMPSHIRE & a.

March 31, 1975

*Douglas S. Hatfield, Jr.,* by brief and orally, for the plaintiff.

*Warren B. Rudman,* attorney general, and *John S. Kitchen,* attorney *(Mr. Kitchen* orally), for the State.

*Brighton, Fernald, Taft & Hampsey* and *John R. Falby, Jr. (Mr. Falby,* orally) for Peterborough Savings Bank, intervenor.

GRIMES, J. The issue in this case is whether a "grandfather clause" in the statute regulating branch banking violates the equal protection clauses of the Constitutions of New Hampshire and the United States.

This is an appeal pursuant to RSA 384-B:2 V and RSA 541:6 from a decision of the board of trust company incorporation, the State banking regulatory agency, which granted an application of the Peterborough Savings Bank to establish a branch in the town of Antrim, New Hampshire. The application was granted after a public hearing on September 18, 1974, over the objection of the plaintiff, The Valley Bank, of Hillsborough, New Hampshire. A subsequent motion by The Valley Bank for rehearing was denied.

The essential facts of the case are these. Peterborough Savings Bank, a state-chartered mutual savings institution established in the 1800's, applied to the board of trust company incorporation for approval of a branch bank in Antrim, a town not contiguous to its principal place of business in Peterborough but within fifteen miles thereof. The Valley Bank, a state-chartered commercial bank with a savings department, opened for business on December 20,

1973, in the town of Hillsborough, which is within ten miles of Antrim. The Valley Bank opposed Peterborough Savings' April 1974 application at the administrative hearing on a number of grounds which included allegations of insufficiency of evidence, equity and fairness, and a denial of equal protection because of the grandfather clause of the branch-banking statute. RSA 384-B:2.

Although the bank examiner found The Valley Bank would likely suffer some adverse effects from Peterborough Savings' expansion, there was "sufficient reason to believe that Valley Bank could remain a viable and competing institution. The public convenience and advantage appear to outweigh the reasons for insulating The Valley Bank from additional competition."

The board of trust company incorporation found that "public convenience and advantage appear to outweigh the reasons for insulating The Valley Bank from competition." Therefore, the board unanimously approved Peterborough Savings' application for a bank in Antrim.

None of the factual findings of the board of trust company incorporation are challenged on this appeal. The sole attack here is whether the branch-banking statute is violative of the equal protection clauses of the Constitutions of the United States and New Hampshire. The contested portion of the New Hampshire statute reads as follows: "384-B:2 Branch Offices. No bank or officer, director, agent or employee thereof shall transact any part of its usual business of banking at any branch office except as follows: I. With the approval of the board, any bank may . . . (c) establish and operate a branch office within any noncontiguous town any part of which is within a radius of fifteen miles of its principal office, provided no bank or national bank in existence on the effective date of this act [October 1, 1963] and still operating is located anywhere in this state within a radius of ten miles of the location of any such proposed branch office . . . ."

That provision of the statute which establishes different treatment of parties based on a date certain has become historically known as a "grandfather clause." C. Antieau, Modern Constitutional Law 8:19 (1969, Supp. 1974); 4 A.L.R.2d 667 (1949, Supps. 1971, 1974). The net effect of the law is to provide a benefit for financial institutions founded prior to October 1963 by limiting the proximity of potential competition, and to burden institutions established after that date with the possibility of competition via branching but without providing the concomitant right to these newer organizations to intrude into territory of those banks created before October 1, 1963.

This court is mindful of the fact that injury resulting from competition is rarely classified as a legal harm but rather is deemed a natural risk in our free enterprise economy. 15A C.J.S. *Competition* (1967, Supp. 1974); W. Prosser, Law of Torts, § 130, at 954-62 (1971). Although it is the policy of the state and federal governments to promote competition, there is a delicate balance to be achieved. *United States v. Standard Oil Company*, 47 F.2d 288, 297 (1931); 15 U.S.C.A. 1-11 (1973); N.H. CONST. pt. II, art. 83; RSA ch. 358-A (Supp. 1973); ch. 356. *See generally* 1 H. Toulmin, A Treatise on Anti-Trust Laws (1949, Supp. 1974).

Legislative justification for the branch-banking statute in New Hampshire is in part attributable to the desire for increased economic competition among this state's financial institutions. Branch banking is perceived as a stimulus to competition. Commission on Money and Credit, Money And Credit: Their Influence on Jobs, Prices and Growth 164-67 (1961); Commission on Financial Structure and Regulation, The Report of the President's Commission on Financial Structure and Regulation 60-62, 113 (December 1972). It was the banking industry itself which sought these changes. N.H.S. Jour. 719, 724 (1963). A competing interest, however, which the legislature recognized was that unbridled branching might result in greater economic concentration, since larger banks might well be able to out-compete a number of existing smaller institutions. N.H.S. Jour. 725 (1963). Shull, *Bank Expansion: The New Competition and Old Predatory Practices,* 91 Banking L.J. 726 (1974).

The compromise achieved was a limited branch bank statute which permitted some restricted geographical branching by all institutions and yet to a limited extent preserved to existing banks that freedom from competition which they had enjoyed under the unitary banking environment prior to the passage of RSA ch. 384-B. *See* Baker, *Bank Expansion: Geographic Barriers,* 91 Banking L.J. 707 (1974); Note, *Branch Banking: The Current Controversy,* 16 Stan. L. Rev. 983 (1964). A review of both the literature and legislative history leads us to conclude that the legislation sought to strike a balance between such factors as competition, financial stability, and the potential adverse consequences of concentration in the banking field. Note, *Branch Banking – Restrictive State Laws,* 38 Notre Dame Lawyer 315 (1963); Note, 48 Denver L.J. 575 (1972).

Absent some infringement of a fundamental right or application of some recognized suspect classification, the constitutional standard to be applied is that of rationality. *Belkner v. Preston,* 115 N.H. 15, 332 A.2d 168 (1975); *Peters v. University of N.H.,* 112 N.H.

120, 121, 289 A.2d 396, 397 (1972). Economic legislation such as RSA 384-B:2 is typically subject to a rational basis test and places the burden on the challenger to prove that whatever classification is promulgated is arbitrary or without some reasonable justification. *Richardson v. Belcher,* 404 U.S. 78, 81-82 (1971); *United States Dep't of Agriculture v. Moreno,* 413 U.S. 528, 533-38 (1973); *Johnson v. Robison,* 415 U.S. 361, 374-83 (1974). *See also Granite State Grocers Ass'n v. State Liquor Comm'n,* 112 N.H. 62, 289 A.2d 399 (1972).

Grandfather clauses used within the financial field have been sustained because they afford a certain degree of economic stability within the market place by preserving the position of earlier entrants, thereby protecting the general welfare. *Braeburn Securities Corp. v. Smith,* 15 Ill. 2d 55, 153 N.E.2d 806 (1958), *appeal dismissed,* 359 U.S. 311 (1959); *United States v. Maryland Savings-Share Ins. Corp.,* 400 U.S. 4 (1970). *See also Opinion of the Justices,* 102 N.H. 106, 151 A.2d 236 (1959). In this case the legislature clearly considered a variety of circumstances including financial stability, not only in their legislative discussion but within the text of the legislation itself. RSA ch. 384-B; N.H.S. Jour. 719-25 (1963). Consequently, we do not find the legislative rationale behind the provision here in question to be unreasonable or patently arbitrary in nature so as to violate equal protection. *See* Note, *Legislative Purpose and Federal Constitutional Adjudication,* 83 Harv. L. Rev. 1887 (1970).

The legislature has a right to make distinctions in its legislative enactments between existing rights and conditions and the rights and conditions which may come into existence in the future when there is a rational basis for such action. *Sperry & Hutchinson Co. v. Rhodes,* 220 U.S. 502, 505 (1911); *Opinion of the Justices,* 99 N.H. 505, 507, 105 A.2d 924, 926 (1954). Grandfather clauses, as in this instance, not only "protect against loss to those who may have relied upon prior laws or regulation [but] they serve a rational and useful purpose in encouraging orderly change in government to meet new and desirable ends . . . ." and are used as a legislative technique of compromise to make legislation "more palatable and thus more possible by due attention to alleviation of hardship caused by change." *Poynter v. Drevdahl,* 359 F. Supp. 1137, 1143 (W.D. Mich. 1972).

In the present case, the branch banking statute does not prohibit new banks from entering into the market, or prohibit them from branching or competing with other New Hampshire banks with respect to deposits, loans and investments. RSA ch. 384-B. These factors alone take the case out of the reach of *Mayflower Farms*

*v. Ten Eyck,* 297 U.S. 266 (1936), and *Morey v. Doud,* 354 U.S. 457 (1957), on which The Valley Bank relied.

The Valley Bank argued that the cases relied upon which upheld grandfather clauses do not apply to this case because RSA ch. 384-B creates a benefit by permitting branching and thus differs from those statutes which create detriments or burdens. However, what is a benefit to some may be a detriment to others. The grandfather clause of RSA 384-B:2 relates not to the benefit which is conferred on those who are permitted to branch but rather to the detriment to existing banks due to competition from branches which the statute permits.

The distinctions and classifications in the branch-banking law thus appear to be both sensible and constitutional.

*Appeal dismissed.*

All concurred.